NORMAN GAINES *v.* COMMISSIONER
OF CORRECTION
(AC 30699)

Bishop, Lavine and Dupont, Js.

---

Argued September 14—officially released November 16, 2010

*C. Robert Satti, Jr.*, supervisory assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Gerard P. Eisenman*, senior assistant state's attorney, for the appellant (respondent).

*James B. Streeto*, assistant public defender, for the appellee (petitioner).

*Opinion*

BISHOP, J. The respondent, the commissioner of correction, appeals from the judgment of the habeas court granting in part the revised second amended petition for a writ of habeas corpus filed by the petitioner, Norman

Gaines. The respondent claims that the court incorrectly determined that the petitioner had established ineffective assistance of trial counsel and that he was prejudiced by counsel's purported ineffectiveness. We disagree and, accordingly, affirm the judgment of the habeas court.

In the underlying criminal matter, the petitioner was charged with two counts of murder in violation of General Statutes § 53a-54a, one count of capital felony in violation of General Statutes § 53a-54b (8), and one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a. After a trial by jury, he was found guilty of all four counts and sentenced to a total effective term of life imprisonment without the possibility of release.[1] In the petitioner's direct appeal, the Supreme Court affirmed the judgment. *State* v. *Gaines*, 257 Conn. 695, 778 A.2d 919 (2001).

In its opinion, the Supreme Court set forth the factual background as follows: "On October 29, 1996, at approximately 7 p.m., Carl Wright was driving down Maplewood Avenue in Bridgeport between Poplar Street and Howard Street, when two persons crossed the street in front of his car. One of the persons walked to the driver's side of a car parked on the side of the street, and the other person walked to the passenger's side of the car. Both persons then fired multiple gunshots into the parked car. Wright could not identify the race or gender of the shooters because they were wearing hooded sweatshirts, with the hoods pulled over their heads.

---

[1] The trial court merged the conviction on the two murder counts with the capital felony conviction, which mandates a sentence of life imprisonment without the possibility of release if the death penalty is not imposed. The court also sentenced the petitioner to twenty years incarceration on the conspiracy conviction, to run concurrently with the life sentence.

"Shortly before the shooting, Tyrell Allen had been walking down Maplewood Avenue toward Howard Street and had spoken to Marsha Larose, who also was walking down the street. Larose stopped to speak to someone in a parked car. Allen continued down Maplewood Avenue and turned right onto Howard Street, at which time he no longer could see Larose or the parked car. Allen then heard approximately twenty gunshots and threw himself to the ground. A short time later, two men ran from the direction of Maplewood Avenue down Howard Street and past Allen. Allen described one of the men as approximately five feet, ten inches tall, light-skinned with a flat nose and medium build and stated that he was wearing an orange or mustard colored hooded sweatshirt. Allen claimed that the other man was wearing a black hooded sweatshirt and was in his twenties.

"At some point after the shooting, Officer Wilfred Torres of the Bridgeport police department received a radio call to proceed to Maplewood Avenue in Bridgeport. Upon arrival, he saw a large crowd surrounding the parked car. The body of a woman, later identified as Larose, lay on the ground near the right passenger side of the car. The body of a man, later identified as Gary Louis-Jeune, was slumped over in the driver's seat of the car. . . .

"The Bridgeport police recovered several spent .22 and .45 caliber casings from the scene of the shooting. The medical examiner also recovered several bullets and bullet fragments from the bodies of the victims. Edward Jachimowicz, a firearms and tool mark examiner with the forensic science laboratory of the Connecticut department of public safety, testified that all of the .22 caliber casings recovered at the scene had been fired from the same gun and that all of the .45 caliber casings had been fired from another gun. He was able to identify several of the bullets recovered from the

bodies of the victims as .22 caliber and one of the bullets as .45 caliber. He testified that the .22 caliber bullets most likely were fired from a semi-automatic pistol manufactured by Ruger or Browning.

"Leo Charles testified that, at some time before October 31, 1996, he had an encounter with the [petitioner], [Ronald] Marcellus [a coconspirator] and 'Nunu' Shipman. He did not indicate where the encounter had taken place. During the encounter, Charles gave his car keys to Marcellus, who told him to give the keys to Shipman. Shipman, however, was unable to drive the car because it had a standard shift. Charles then drove the car to his house in order to show Shipman how to operate the shift. During the drive, Charles saw that Shipman had a .45 caliber gun and that the [petitioner] had a .22 caliber Ruger. When they arrived at Charles' house, Charles went inside. Shipman and the [petitioner] then took Charles' car. Forty-five minutes later, Shipman and the [petitioner] returned to Charles' house. Shipman came to the door, threw a black sweatshirt at Charles and told him to keep it.

"Torrance McClain testified that, in October, 1996, the [petitioner] lived with him at 31 Laurel Court in Bridgeport. Shortly before October 31 that year, Shipman came to 31 Laurel Court, and McClain gave him a key to the basement of a building there, where a .45 caliber gun and a .22 caliber gun were kept. McClain saw Shipman go into the basement and leave with the guns. McClain then went shopping with Eleanor Figueroa and her children. While McClain was shopping, he received a message on his beeper and returned to 31 Laurel Court. When he arrived, the [petitioner], Shipman and others were there. Shipman asked McClain for a ride to a pay telephone on State Street, which McClain provided. After Shipman made a telephone call, McClain and Shipman drove to the scene of the shooting, where they stayed for approximately five

minutes. They then returned to 31 Laurel Court. The [petitioner] was there at that time and told McClain that he 'felt good' because 'they killed somebody.' The [petitioner] told McClain that Shipman had used the .45 caliber gun in the killing and that the [petitioner] had used the .22 caliber gun. At some point, Shipman asked McClain for the key to the basement again and Shipman subsequently returned the guns there.

"Figueroa also testified about the day of the shooting. She stated that, in late October, 1996, she was living with her mother-in-law in an apartment at 25 Albion Street in Bridgeport. At some time after 5 p.m., she left the apartment to go shopping with McClain and her three children. After about one and one-half hours, they left the store and headed back to 25 Albion Street. While they were driving, McClain's beeper went off. He dropped her and the children off at 25 Albion Street and left in the car. He returned to 25 Albion Street sometime after midnight.

"Figueroa also testified that, at some point in November or December, 1996, she visited the [petitioner] in jail, where he was incarcerated on charges unrelated to this case. The [petitioner] told her at that time that Larose had been killed because she 'was in the wrong place at the wrong time,' indicating that he could not risk the potential of Larose being a witness to the shooting of Louis-Jeune. The [petitioner] also told her that a .22 caliber gun had been used in the killings. In addition, the [petitioner] told her that he was supposed to be paid $1500 for the killings, but that he never was paid because he had been incarcerated.

"Figueroa further testified that, at some point, the [petitioner] called her from jail and told her to tell Shipman's uncle to dispose of the .22 caliber gun because it had been used in the shooting. She testified that the [petitioner] had made that request on the same

day that Marcellus was arrested in connection with the killings, and that the [petitioner's] attitude concerning his involvement in the killings had become more serious after Marcellus' arrest. The [petitioner] also told her that he had disposed of the clothes that he had worn during the shooting.

"Figueroa testified during cross-examination that drugs and guns were kept in the basement of the building at 31 Laurel Court, and that she and the [petitioner] sold drugs together at that location. She also testified that she had encouraged the [petitioner] to confess about his involvement in the killings and had told him that she could provide him with the name of a police officer to whom he could 'tell . . . what he did for [Marcellus].' During redirect examination, Figueroa testified, without objection, that the [petitioner] and McClain were dealing drugs for Marcellus. During recross-examination, Figueroa testified that McClain was Marcellus' 'lieutenant on the block . . . .'

"Sergeant James Tyler of the Bridgeport police department testified that he had been in charge of the investigation of the shooting and that, as of February, 1997, his investigation had led him to believe that the [petitioner] and Shipman were active participants in the killings and that Marcellus was an accomplice.

"The [petitioner] testified that, at some point after moving in with McClain and Figueroa in July, 1996, he had begun selling drugs to earn money to pay rent to Figueroa. He testified that Figueroa had given him the drugs and that, after he had sold them, he would give her the money. He also testified that Figueroa was the lieutenant until she moved to 25 Albion Street in late August, 1996, at which time McClain became the lieutenant.

"The [petitioner] testified that, in early October, 1996, problems had arisen between him and McClain. The

[petitioner] testified that he had been present during a conversation between McClain and Marcellus when McClain told Marcellus that the [petitioner] had given McClain $900 in drug proceeds, when, according to the [petitioner], he had given McClain $1,000. The [petitioner] told Marcellus that McClain was lying.

"The [petitioner] testified that Figueroa had visited him while he was in prison on unrelated charges and repeatedly tried to get him to admit that he was involved in the shooting. The [petitioner] thought that she was joking about his involvement until he learned that Marcellus had been arrested and had signed a statement implicating him, at which time he believed that he would be the next person to be arrested in connection with the killings.

"The [petitioner] testified during cross-examination that he had been arrested and jailed twice during the fall of 1996 on charges unrelated to the shooting, and that Marcellus posted a $7500 bail bond each time. During redirect examination, the [petitioner] testified that it was his understanding that Marcellus posted bond for him because, when a drug dealer is arrested, the person whose drugs are being sold posts bond. The [petitioner] testified that he did not kill the victims, that no one ever asked him to kill the victims and that he had no reason to kill the victims." Id., 697–703.

After his unsuccessful appeal, the petitioner brought this petition for a writ of habeas corpus, claiming, inter alia, that his trial counsel was ineffective in failing to investigate and to present at trial two witnesses whose testimony would have supported an alibi defense.[2] By memorandum of decision filed December 9, 2008, the habeas court agreed with the petitioner and granted

[2] The petitioner raised other claims in his habeas complaint, but the court did not find in his favor on those allegations. Those determinations are not challenged in this appeal.

the petition in part, finding that the petitioner's trial counsel had been ineffective and that the petitioner was entitled to a new trial because he had been prejudiced by counsel's ineffectiveness. This appeal followed the habeas court's granting of the respondent's petition for certification to appeal from its judgment.

At the outset, we set forth the applicable standard of review and the law governing ineffective assistance of counsel claims. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, [466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* v. *Washington*, supra, 687, this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied." (Citation

omitted; internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 509–10, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

At the habeas trial, the petitioner testified that, at the time of the criminal trial, he could not recall where he was or what he was doing when the murders occurred. He contends that his trial counsel, attorney Alexander Schwartz,[3] should have interviewed, and presented as witnesses at trial, Madeline Rivera and Rivera's mother, Luz Davila. The petitioner testified that he mentioned Rivera to Schwartz as a potential witness, that Schwartz should have interviewed her and that, if he had, he likely would have been led to Davila, and those women would have testified as to his whereabouts on the night in question, thus providing him a credible alibi defense.

Rivera also testified at the habeas trial. She testified that, on the day and night in question, she was moving and that while she and her mother picked up a moving truck, the petitioner was taking care of her children. She stated that she left her children with the petitioner at approximately 4:30 p.m. and returned home at about 7 p.m., at which time, Shipman and the petitioner helped her load the truck with her belongings. After the truck was loaded, Shipman and the petitioner moved Rivera's belongings to her new residence. Rivera testified that, throughout that night, they probably made three trips with the moving truck to move her belongings, that they didn't finish until shortly after midnight and that the petitioner was present during the entire time. Rivera stated that the petitioner watched her children while

---

[3] The petitioner's co-counsel at trial was attorney Megan McLoughlin-Mikos. Because McLoughlin-Mikos was not involved in the pretrial stage of the petitioner's case, the habeas court determined that she played no role in deciding which witnesses to investigate or to present at trial and, accordingly, could not have rendered ineffective assistance in that regard. That holding is not challenged in this appeal.

she and Shipman returned the moving truck. Rivera testified that she never spoke to a police officer and was never contacted by an investigator regarding the charges against the petitioner. Rivera indicated, however, that when she went to the petitioner's trial, she spoke to an individual regarding a letter that she received from the petitioner, but she could not recall who that individual was. On cross-examination, Rivera testified that she told the petitioner's attorney, when she saw him at the trial of Shipman and the petitioner, that Shipman and the petitioner were helping her move on the night in question. Rivera stated that she had not earlier offered this information regarding the petitioner's whereabouts on the night in question because nobody ever asked her. She also indicated that she did not volunteer the information because she did not think that anyone would "listen to a parolee."

Davila testified that, on the night in question, she went with Rivera and Shipman to rent a truck to move Rivera's belongings to her new residence. She indicated that she, Rivera and Shipman returned to Rivera's residence between 6:30 and 7 p.m. and that the petitioner was there when they arrived. She stated that at approximately 7:30 p.m., she went home while the others loaded the truck. Davila stated that she returned to Rivera's residence at about 9 p.m. She then went to Rivera's new residence to open the door so that Shipman and the petitioner could unload the truck there, and she reminded them that she needed to return the truck by 12 a.m. Davila indicated that she went home at approximately 10 p.m. She testified that she was never contacted by anyone regarding the killings on the night of October 29, 1996, until a couple of weeks before the habeas trial.

Schwartz testified that his theory of defense at the petitioner's criminal trial was that Figueroa and McClain committed the murders, and that the petitioner

was not involved in any way. After the petitioner had been arrested several months after the murders took place, he told Schwartz that he could not recall where he was on the night in question. Schwartz indicated that the petitioner was not able to give him the names of anyone who could confirm where he was at the time the killings took place and that the petitioner did not tell him that either Rivera or Davila had any information that might be helpful to his case. Schwartz testified that the petitioner did give him Rivera's name but that the petitioner did not state that Rivera knew where he had been on the night of the murders. Schwartz also testified that he did not know that she might have had information that would assist in the petitioner's defense. He testified that if he had known that there was testimony regarding a possible alibi for the petitioner, he would have investigated it. He said that he would have presented Rivera and Davila as witnesses if he had known what information they could have provided and that the jury should have heard their testimony. Schwartz further indicated that he thought that their testimony might have made a difference in the jury's verdict. In sum, Schwartz testified that although the petitioner gave Rivera's name to him, he did not recall ever speaking to Rivera about the petitioner's case, and he had not heard of Davila until he saw the habeas petition, but that if he had known these individuals could have proffered an alibi for the petitioner, he would have called them to testify and he believed that their testimony would have made a difference in the trial's outcome.

The habeas court found the testimony of Rivera and Davila to be credible and compelling. Additionally, the court found credible the petitioner's testimony that he did not recall where he was on the night of the killings in light of the fact that he was not arrested until approximately five months later. The court also found that,

under the circumstances of this case, in which the petitioner was not able to provide any information as to his whereabouts on the night in question, Schwartz should have investigated Rivera to determine if she had any useful information because the petitioner had given her name to him. The court further found that if Schwartz had conducted an adequate investigation, he would have contacted Rivera, and, through her, he would have reached Davila, both of whom provided an alibi defense for the petitioner. In reaching this conclusion, the habeas court emphasized that even though the petitioner did not tell Schwartz that Rivera could provide him with an alibi, Schwartz should have interviewed her to ascertain what information she did have, especially in light of her status as McClain's sister and the fact that Schwartz was attempting to implicate McClain in the crime. The court determined that Schwartz' failure to investigate and to call Rivera and Davila as witnesses prejudiced the petitioner, as their testimony likely would have affected the verdict, especially in light of the weakness of the state's case.

On appeal, the respondent argues that the court improperly found Schwartz ineffective for failing to investigate or to interview a witness about whom he had no specific information.[4] "While it is incumbent on a trial counsel to conduct a prompt investigation of the case and explore all avenues leading to facts relevant

[4] The respondent also claims that the court improperly credited the testimony of Rivera and Davila. We note, however, that "[t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Douros* v. *Commissioner of Correction*, 111 Conn. App. 525, 528–29, 959 A.2d 1041 (2008). Thus, the respondent's claim in this regard must fail unless we are to override the habeas court's credibility determinations.

to the merits of the case and the penalty in the event of conviction . . . counsel need not track down each and every lead or personally investigate every evidentiary possibility. . . . In a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation, but by demonstrable realities. . . . One cannot successfully attack, with the advantage of hindsight, a trial counsel's trial choices and strategies that otherwise constitutionally comport with the standards of competence." (Internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, 113 Conn. App. 378, 402, 966 A.2d 780 (2009). Nevertheless, a criminal defendant's right to have the assistance of counsel is the right to the *effective* assistance of counsel. *McMann* v. *Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970). This includes effective assistance not only at the trial itself but in preparation for the trial. "Adequate preparation for trial often may be a more important element in the effective assistance of counsel to which a defendant is entitled than the forensic skill exhibited in the courtroom. The careful investigation of a case and the thoughtful analysis of the information it yields may disclose evidence of which even the defendant is unaware and may suggest issues and tactics at trial which would otherwise not emerge." *Moore* v. *United States*, 432 F.2d 730, 735 (3d Cir. 1970). Defense counsel should "conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case . . . ." See 1 A.B.A. Standards for Criminal Justice (2d Ed. 1980) c. 4, standard 4-4.1, p. 4-53. These exhortations from our decisional law are particularly apt to the circumstances at hand in which the petitioner had no knowledge of his whereabouts on the evening in question but was persistent in his reporting to counsel that he was not present at the crime scene.

Although we acknowledge that counsel need not investigate every possible lead while investigating a case, under the very specific circumstances presented in this case, we agree with the habeas court that Schwartz' representation of the petitioner was ineffective because he failed to investigate adequately. The habeas court concluded that "[s]imply contacting one of the two people the petitioner had mentioned by name would have led to the discovery of the alibi evidence." Because the petitioner, who was sixteen years old at the time of the incident, could not recall where he was or what he was doing on the night of the murders, Schwartz logically should have explored whether an alibi defense might have been available to the petitioner. A logical place to begin that investigation would have been with any individuals whose names had been given to him by the petitioner or any individuals who might have been associated with the petitioner. Furthermore, because the petitioner told Schwartz that he did not commit those crimes and was not present at the crime scene, and the petitioner's complete lack of involvement was the theory of defense ultimately adopted by Schwartz, Schwartz should have sought to interview potential witnesses to determine if he could ascertain where the petitioner was on the night in question or who else may have been involved in the killings. In sum, given the petitioner's stated lack of recall, which the habeas court found to be credible, it is not imposing an unreasonable burden on Schwartz to have expected him to contact Rivera, who was identified by the petitioner as a potential witness, to see if she had any information related to the petitioner's whereabouts on the night in question and possible involvement in the murders. On the basis of the foregoing, we cannot conclude that the court improperly determined that the petitioner was denied the effective assistance of counsel.

Further, we agree with the court that if the jury had heard the testimony of Rivera and Davila purporting to account for the petitioner's whereabouts on the night the murders took place, particularly when considered with the theory that the murders were committed by Figueroa and McClain, there is a reasonable probability that the outcome of the petitioner's criminal trial would have been different. See *Strickland* v. *Washington*, supra, 466 U.S. 694 ("reasonable probability is a probability sufficient to undermine confidence in the outcome"). What differentiates this case from most others is the habeas court's conclusion that the petitioner suffered prejudice as a result of Schwartz' failure to investigate. In many cases, the habeas court is left to speculate about how hypothetical or unidentified witnesses would have affected the outcome of a criminal trial and is unable to make a finding that a petitioner has been prejudiced by counsel's inadequate performance. In other cases, the habeas court is faced with the contention that counsel's decision was tactical and not the result of deficient representation. In this case, however, the habeas court had the opportunity to hear and to evaluate the two claimed alibi witnesses, whose testimony was found to be credible and compelling. Moreover, Schwartz testified that he would have called Rivera and Davila as witnesses if he had known the information they could provide and that he believed that their testimony might have made a difference in the verdict.[5] Finally, and as noted by the habeas court, the state's case at trial was not particularly strong, as there were no indifferent eyewitnesses and no forensic evidence tying the petitioner to the crimes. Thus, there was a solid basis for the habeas court's conclusion that the petitioner had proved prejudice. Accordingly, we

---

[5] Although, as noted, the petitioner's conviction was affirmed on direct appeal, it is worth noting, as counsel for the petitioner points out, that the principal evidence against the petitioner was the testimony of McClain and Figueroa, who were husband and wife, and admitted drug dealers.

conclude that the habeas court properly granted the petitioner's petition for a writ of habeas corpus and remanded the case to the trial court for a new trial.

The judgment is affirmed.

In this opinion the other judges concurred.