## TERANCE ELSEY *v.* COMMISSIONER OF CORRECTION
### (AC 31132)

Harper, Robinson and Alvord, Js.

---

Argued September 24, 2010—officially released January 18, 2011

*Jodi Zils Gagne*, special public defender, for the appellant (petitioner).

*Tamara A. Grosso*, special deputy assistant state's attorney, with whom were *Michael J. Proto*, assistant state's attorney, and, on the brief, *Scott J. Murphy*, state's attorney, for the appellee (respondent).

*Opinion*

HARPER, J. The petitioner, Terance Elsey, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claims that the habeas court improperly concluded (1) that he failed to prove that the state suppressed exculpatory evidence at his criminal trial in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and (2) that he failed to prove ineffective assistance of his trial counsel. We affirm the judgment of the habeas court.

The decision of this court in the petitioner's direct appeal sets forth the following facts underlying the petitioner's conviction. "On January 12, 2000, three people were residing in a house in New Britain. At about 12:30 a.m., the occupants heard numerous gunshots. Several bullets entered the house through the windows and the walls. Some of the bullets entered a living room, where one of the victims, a young man, was watching television. The young man dove to the floor and told the other victims to call the police. One of the other victims called the New Britain police.

"The sound of the gunshots alarmed other people in the neighborhood and caused them to look out the windows in their homes. A woman living next door to the victims' house looked out her window and observed a small fire burning on the side of the victims' house. The fire, located at the ground level, was approximately five feet wide and one foot tall. It died out on its own within a few minutes but caused minor damage to the house. In addition to surprising the woman, the gunshots startled two men in the house across the street

from the victims' house. The two men saw two or three unidentified men near the victims' house and called the police. The men in the house then observed the unidentified men run to a black Pontiac Grand Am car. Both of the men in the house noted that the unidentified man who got into the backseat of the car was wearing a flannel shirt with a white pattern. The car left the scene, and the men in the house were unable to determine if there was a license plate on the car.

"Minutes after the gunfire, a Newington police officer saw a black Pontiac Grand Am car without a rear license plate heading northbound on the Berlin Turnpike. The officer stopped the car and noticed that there were three men inside. The man in the rear seat was wearing eyeglasses and a white or light colored shirt. The officer was aware, via a Newington police broadcast, of the earlier shooting in New Britain. The officer spoke to the driver of the car, who claimed that he had no identification. He was able to provide only the rental agreement for the car. The driver explained that he had just come from the New Britain area. The officer suspected that the men in the car were associated with the shootings and fire, but before the officer could conduct further investigation, the car sped off. The officer gave chase but was unable to catch up to the car. Two other police cruisers and one state police trooper joined the chase.

"The chase, which continued with the police vehicles reaching speeds of 100 miles per hour, ended abruptly when the Pontiac smashed into a concrete wall after turning off an exit in Hartford. The state police trooper was the first to reach the scene and witnessed two men, who had been sitting in the front seats, running away. The man in the backseat, wearing a light colored shirt, left the car and, ignoring the trooper's commands, ran from the scene of the accident. Other local police and state police trooper units arrived on the scene, but despite the presence of a K-9 unit, were unable to locate

the three men. The police brought to the accident scene the two men who had witnessed the events at the victims' house. Both men stated that the car at the scene of the accident was the same black Pontiac Grand Am that the unidentified men had entered outside the victims' house.

"The police then turned their attention to the car. They learned that Robert Lane had rented the car. Robert Lane is the father of Ahmad Lane, a friend of Ronald Hughes, the [petitioner's] cousin. Inside the car, the police found a pair of wire rimmed eyeglasses, a cell phone registered to the [petitioner] and another cell phone registered to Hughes. The police also discovered latent fingerprints on the car. The latent fingerprints matched the [petitioner's] known fingerprints for his thumb, and index and middle fingers. In addition, the gasoline cap of the car was missing.

"Further investigation of the cell phones revealed that there were at least eight calls made between the [petitioner's] cell phone and Hughes' cell phone between 9:30 and 10:30 p.m. earlier that evening. In addition, there was a call from the [petitioner's] cell phone to a female friend of the [petitioner] at 11:55 p.m., approximately thirty-five minutes before the crimes at issue. The [petitioner's] cell phone account was active, but it was deactivated the day after the incident.

"The police also investigated the scene at the victims' house. Near the scene of the fire, the police found a cigarette lighter and a champagne bottle with a burned label and gasoline inside. The police also found five nine millimeter shells, all from the same gun, and a .22 caliber bullet. Inside the victims' house, the police recovered three nine millimeter bullets and two .38 caliber bullets. There were eight bullet holes in the house, which, along with the presence of the two different caliber bullets, led the police to believe that at least two different guns were involved in the shooting.

"Twelve days after the shooting, the police searched the [petitioner's] house. The police recovered various paraphernalia related to the [petitioner's] cell phone that was found in the car, a new cell phone, an unfired .22 caliber round, a photograph of the [petitioner] wearing wire rimmed eyeglasses, an empty eyeglass case that fit the recovered eyeglasses, a pair of contact lenses and a blank application for a pistol permit. Notably, there was not another pair of eyeglasses in the [petitioner's] apartment. The .22 caliber round was the same as the one recovered at the scene of the crimes. A master optician compared the wire rim eyeglasses recovered at the scene of the car crash with the [petitioner's] contact lenses. The master optician testified that '[t]hese particular eyeglass lenses [that were found in the car] do match these contact lenses [that were found in the petitioner's apartment]. So, these eyeglasses would work for whoever wears these contact lenses.' When asked, 'Did anyone other than the person wearing these contact lenses wear these glasses?' the master optician replied, 'That would be unlikely because it's a very strong prescription and because they match at that certain level of strength.' " *State* v. *Elsey*, 81 Conn. App. 738, 740–43, 841 A.2d 714, cert. denied, 269 Conn. 901, 852 A.2d 733 (2004).

At the petitioner's trial, Wayne Stephens, the son of one of the victims, testified that he had lent his car to a friend who had used the car to rob Hughes, the petitioner's cousin. See id., 743. Stephens testified that the next day, the petitioner's brother told him, "I can't get you, so I know where your mom lives [at] and I'm going there tonight." (Internal quotation marks omitted.) Id.

The petitioner was convicted of "arson in the first degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-111 (a) (1), conspiracy to commit arson in the first degree in violation of General Statutes

§§ 53a-48 and 53a-111 (a) (1), two counts of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (1) and (4), two counts of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (1) and (4), and three counts of reckless endangerment in the first degree in violation of General Statutes § 53a-63." Id., 739. The petitioner was sentenced to a total effective term of thirty years imprisonment, suspended after fifteen years, with five years of probation. On direct appeal, this court affirmed the petitioner's convictions, but held that the petitioner's separate sentences for the three conspiracy counts violated the petitioner's right to be free of double jeopardy. Id., 752. This court ordered that the three conspiracy counts be combined and two of the sentences vacated. Id. The petitioner's subsequent petition for certification to appeal to our Supreme Court was denied. State v. Elsey, 269 Conn. 901, 852 A.2d 733 (2004).

The petitioner filed his original petition for habeas corpus on February 7, 2005, and subsequently filed the operative third amended petition for habeas corpus on September 2, 2008. Although the petitioner presented a multitude of grounds in support of his petition, we need only address those grounds that are relevant to this appeal. First, the petitioner claimed that the state violated his right to due process by failing to disclose the fact that Stephens had received a sentence modification shortly before testifying for the state. Additionally, the petitioner alleged that his trial counsel provided ineffective assistance for several reasons relating to his investigation and examination of Stephens as well as for the manner with which he responded to the state's presentation of evidence relating to a gun and a bullet. After conducting a hearing, the habeas court found that the petitioner's claims were without merit and denied his petition. The petitioner's petition for certification to

appeal to this court was granted and this appeal followed.

## I

The petitioner's first claim is that the court improperly concluded that he failed to prove that the state suppressed exculpatory evidence in violation of *Brady*. Specifically, the petitioner claims that the state should have disclosed the fact that Stephens received a sentence modification prior to testifying against the petitioner. We reject the petitioner's claim.

The following additional facts underlie the petitioner's claim. On January 7, 2002, the state submitted its witness list in the petitioner's criminal trial, which did not include Stephens as a witness. On January 12, 2002, the petitioner's trial counsel filed a motion requesting disclosure of all exculpatory material. On January 17, 2002, the state amended its witness list to include Stephens and responded to the petitioner's request by stating: "No specific consideration has been promised or received in exchange for information or testimony in relation to this investigation or prosecution." On January 9, 2002, however, two weeks prior to testifying and eight days prior to his addition to the witness list, Stephens received a sentence modification. Ultimately, Stephens' testimony linked the petitioner to the victims and provided evidence as to the petitioner's possible motive. After Stephens testified in the petitioner's criminal case, he sought an additional sentence modification, which was denied. At the petitioner's habeas trial, Louis J. Luba, Jr., the state's attorney in the petitioner's criminal trial, testified that Stephens did not receive any favorable treatment in exchange for his testimony. Luba also testified that he did not become aware of Stephens' sentence modification until the petitioner's habeas trial.

In his petition for a writ of habeas corpus, the petitioner alleged that the state's failure to disclose the

information regarding Stephens' sentence modification violated the petitioner's right to due process in violation of *Brady*. After a hearing, the habeas court found that there was "no evidence that the state had an agreement with . . . Stephens and that he would derive some benefit in exchange for his testimony." Because the petitioner failed to establish that there was an agreement between the state and Stephens, the court found that the petitioner's *Brady* claim was without merit.

The petitioner claims that the habeas court improperly concluded that his *Brady* claim was without merit. Specifically, the petitioner claims that the fact that Stephens was added to the witness list late and shortly after receiving a sentence modification is evidence of an implied agreement between the state and Stephens that the state failed to disclose, thus violating the petitioner's right to due process. "The law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Citations omitted; internal quotation marks omitted.) *State* v. *Dixon*, 72 Conn. App. 852, 858, 806 A.2d 1153, cert. denied, 262 Conn. 926, 814 A.2d 380 (2002). "Any . . . understanding or agreement between any state's witness and the state police or the state's attorney clearly falls within the ambit of *Brady* principles. . . . An unexpressed intention by the state not to prosecute a witness does not." (Citation omitted.) *Walker* v. *Commissioner of Correction*, 103 Conn. App. 485, 493, 930 A.2d 65, cert. denied, 284 Conn. 940, 937 A.2d 698 (2007).

"The question of whether there existed an agreement between [a witness] and the state is a question of fact . . . . When reviewing the decision of a habeas court, the facts found by the habeas court may not be disturbed unless the findings were clearly erroneous." (Internal quotation marks omitted.) *Lewis* v. *Commissioner of Correction*, 116 Conn. App. 400, 407, 975 A.2d 740, cert. denied, 294 Conn. 908, 982 A.2d 1082 (2009). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 738, 756 A.2d 799 (2000). "This court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . A petitioner bears the burden of proving the existence of an agreement between the state or police and a state's witness." (Citation omitted; internal quotation marks omitted.) *Lewis* v. *Commissioner of Correction*, supra, 407.

In the present case, we conclude that the habeas court's finding that there was no undisclosed implied agreement between the state and Stephens was not clearly erroneous. The petitioner conceded at oral argument that the record does not contain any evidence of an agreement between the state and Stephens. Rather, the petitioner contends that the close temporal proximity between Stephens' sentence modification and the petitioner's trial, as well as the fact that Stephens did not come forward to testify until after the sentence

modification, two weeks before the petitioner's criminal trial and almost two years after the incident occurred, should be construed as evidence of an implied agreement between Stephens and the state.

The mere fact that Stephens' sentence modification occurred in close temporal proximity to his testimony at trial, however, does not necessarily lead us to conclude that the finding of the habeas court is clearly erroneous. The finding of the habeas court is supported by the facts in the record, namely, Luba's testimony indicating that he was unaware of Stephens' sentence modification at the time of trial and that Stephens did not receive any favorable treatment from the state in exchange for his testimony. In light of the evidence in this case, we cannot say that the court's conclusion was clearly erroneous. Therefore, we affirm the habeas court's finding that there was no implied agreement between Stephens and the state.

The petitioner also claims that, even if there was no implied agreement between the state and Stephens, the fact that Stephens received a sentence modification prior to trial should nonetheless have been disclosed to the petitioner because it constituted impeachment evidence within the ambit of *Brady*. We note that while the habeas court's factual determination as to whether an implied agreement existed is reviewed under the clearly erroneous standard; see id.; "[w]hether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 284, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009).

As previously noted, in order for the petitioner to establish a violation of *Brady*, he must show that the

prosecution suppressed evidence that was both favorable and material. Although we agree that the evidence of Stephens' sentence modification was suppressed and was favorable to the defense, we conclude that the evidence was not material and, as such, the petitioner's *Brady* claim fails.

First, we conclude that, for purposes of *Brady*, the evidence regarding Stephens' sentence modification was suppressed. Neither party disputes the fact that the state did not disclose Stephens' sentence modification despite the defense request. Although Luba testified that he was not personally aware of Stephens' sentence modification at the time of trial, "[t]he [s]tate's duty of disclosure is imposed not only upon its prosecutor, but also on the [s]tate as a whole . . . ." (Internal quotation marks omitted.) *Demers* v. *State*, 209 Conn. 143, 153, 547 A.2d 28 (1988). As such, because the evidence of Stephens' sentence modification was not disclosed to the defense after an affirmative request, we conclude that it was suppressed for *Brady* purposes.

Next, we conclude that the evidence of Stephens' sentence modification was evidence that was favorable to the defense under the second prong of *Brady*. "It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." (Internal quotation marks omitted.) *State* v. *McPhail*, 213 Conn. 161, 167, 567 A.2d 812 (1989). Our Supreme Court has acknowledged that even when certain undisclosed evidence did not support a finding of an implied agreement between the state and a witness, such evidence may nonetheless constitute impeachment evidence under *Brady* if it reasonably could be construed to suggest an "informal understanding" between the state and a witness. *State* v. *Floyd*, supra, 253 Conn. 740 ("if any alleged undisclosed evidence [of the state's favorable

treatment of a witness] constituted impeachment evidence, it is only because the evidence suggested that there was . . . an informal understanding").

In *Floyd,* the defendant claimed that the state failed to disclose an implied agreement with one of its witnesses. Id., 724. Specifically, the defendant argued that the state's lack of opposition to the witness' motion to reduce his bond to a promise to appear and its decision not to prosecute the witness for a probation violation, as well as a letter from the witness' attorney to the state discussing the witness' decision to testify, were evidence of an undisclosed implied agreement. Id., 738–39. The court affirmed the trial court's finding that there was no implied agreement between the state and its witness. Id., 739. The court went on, however, to analyze whether this information should nonetheless have been disclosed as impeachment evidence under *Brady.* Id., 740–48. Although the state conceded that the evidence was favorable to the defendant, ultimately the court concluded that the defendant failed to establish that the evidence was material under the third prong of *Brady.* Id., 746.

Similar to the defendant in *Floyd,* the petitioner in the present case contends that even if there was no implied agreement between the state and Stephens, the fact that Stephens received a sentence modification was impeachment evidence that was favorable to the defense. We agree that this evidence constituted impeachment evidence that was favorable to the defense under the second prong of *Brady.*

Although the fact that Stephens received a sentence modification two weeks prior to testifying did not establish that an implied agreement existed, it was still evidence that could have been used to impeach the credibility of Stephens insofar as it suggested an informal understanding that Stephens was benefiting from

his decision to testify for the state. While the impeachment value of this evidence was not very strong, the fact that Stephens received a sentence modification two weeks before trial, when viewed in conjunction with the fact that Stephens did not come forward to testify until the eve of trial, nonetheless was relevant evidence the defense could have used in an effort to impeach Stephens' credibility. As such, we conclude that the evidence was favorable to the defense.

Finally, we conclude that although the evidence of Stephens' sentence modification was suppressed and favorable to the defense, it was not material under *Brady.* "The test for materiality is well established. The United States Supreme Court . . . in *United States* v. *Bagley,* 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. . . . The United States Supreme Court also emphasized that the *Bagley* test is not a sufficiency of evidence test. . . . A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence

should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. . . . Accordingly, the focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether nondisclosure of the evidence was so unfair as to undermine our confidence in the jury's verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 453–54, 758 A.2d 824 (2000). Our Supreme Court, however, has repeatedly held that " '[w]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady*.' *State* v. *Gant*, 231 Conn. 43, 53, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995)." *State* v. *Floyd*, supra, 253 Conn. 744, quoting *State* v. *McIntyre*, 242 Conn. 318, 324, 699 A.2d 911 (1997).

"It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. . . . The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness. . . . However, [e]vidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest. . . . In this connection, it is important to the *Brady* calculus whether the effect of any impeachment evidence would have been cured by the rehabilitative

effect of other testimony." (Citation omitted; internal quotation marks omitted.) *Morant* v. *Commissioner of Correction,* supra, 117 Conn. App. 296–97. "In determining whether impeachment evidence is material, the question is not whether the verdict might have been different without any of [the witness'] testimony, but whether the verdict might have been different if [the witness'] testimony [was] further impeached by disclosure of the [impeachment evidence]." (Internal quotation marks omitted.) *State* v. *Floyd,* supra, 253 Conn. 744.

In light of this standard, and after a careful review of the record, we conclude that the state's failure to disclose evidence of Stephens' sentence modification does not undermine our confidence in the jury's verdict. As such, this evidence was not material, and the state's failure to disclose it was not a violation of *Brady.*

Although the evidence of Stephens' sentence modification was impeachment evidence that was favorable to the defense, its relative impeachment value was low. The fact that Stephens received a sentence modification two weeks before testifying, when coupled with the fact that he had not previously come forward to testify, had some impeachment value insofar as it suggested Stephens had a motive for testifying. This impeachment value was greatly diminished, however, by the lack of any evidence, other than mere temporal proximity, that Stephens' sentence modification was in any way related to his decision to testify. Thus, while this evidence provided a basis for some suggestion that Stephens was receiving a benefit from his testimony, the likely weight of this suggestion was minimal in light of the lack of evidence demonstrating that Stephens had in fact received his sentence modification due to his decision to testify.

Additionally, although Stephens' testimony established that the petitioner knew the victims and suggested a motive, "this was not a case in which the prosecution's case hinge[d] entirely on the testimony of [the witness in question] . . . ." (Internal quotation marks omitted.) *State* v. *Wilcox*, supra, 254 Conn. 458. Rather, as noted in our decision in the petitioner's direct appeal, there was ample evidence to support the petitioner's conviction. See *State* v. *Elsey*, supra, 81 Conn. App. 740–48. Therefore, we cannot say that the fact that the state did not disclose the evidence of Stephens' sentence modification undermines our confidence in the jury's verdict, as there was no reasonable probability that the jury would have reached a different verdict if it had heard and considered this undisclosed impeachment evidence. See *State* v. *Floyd*, supra, 253 Conn. 744. Accordingly, we affirm the habeas court's decision denying the petitioner's *Brady* claim.

## II

Next, the petitioner claims that the habeas court improperly denied his claim of ineffective assistance of trial counsel. Specifically, the petitioner claims that his trial counsel provided ineffective assistance by (1) failing to investigate Stephens or to seek a continuance to investigate him after his late addition to the witness list, (2) failing to seek a hearing on an apparent violation of a sequestration order, (3) failing to object to certain portions of Stephens' testimony as inadmissible hearsay, and (4) failing to file motions in limine to preclude certain incriminating evidence. We disagree with the petitioner's claim.

Before addressing each aspect of the petitioner's claim, we set forth the legal principles governing our review. "Whether the representation a defendant received at trial was constitutionally inadequate is a

mixed question of law and fact. . . . As such, that question requires plenary review by [an appellate] court unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *Sargent* v. *Commissioner of Correction*, 121 Conn. App. 725, 737, 997 A.2d 609, cert. denied, 298 Conn. 903, 3 A.3d 71 (2010).

"We analyze claims of ineffective assistance of counsel under the test set forth by the United States Supreme Court in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In *Strickland* . . . the United States Supreme Court enunciated the two requirements that must be met before a petitioner is entitled to reversal of a conviction due to ineffective assistance of counsel. First, the [petitioner] must show that counsel's performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversarial process that renders the result unreliable. . . . To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Citation omitted; internal quotation marks omitted.) *Smith* v. *Commissioner of Correction*, 121 Conn. App. 85, 92–93, 994 A.2d 317, cert. denied, 297 Conn. 921, 996 A.2d 1193 (2010). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Adorno* v. *Commissioner of Correction*, 66 Conn. App. 179, 182–83, 783 A.2d 1202, cert. denied, 258 Conn. 943, 786 A.2d 428 (2001).

To satisfy the prejudice prong of the *Strickland* test, "[i]t is not enough for the [petitioner] to show that the errors [made by counsel] had some conceivable effect on the outcome of the proceeding. . . . Rather, [the petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. . . . A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . [A] court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." (Internal quotation marks omitted.) *Cabral* v. *Commissioner of Correction*, 108 Conn. App. 1, 7, 946 A.2d 1278, cert. denied, 288 Conn. 915, 954 A.2d 183 (2008). "Because both prongs . . . [of the *Strickland* test] must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong." (Internal quotation marks omitted.) *Porter* v. *Commissioner of Correction*, 120 Conn. App. 437, 447, 991 A.2d 720, cert. denied, 298 Conn. 901, 3 A.3d 71 (2010).

A

The first aspect of the petitioner's ineffective assistance of counsel claim relates to trial counsel's investigation of Stephens. The petitioner alleges that trial counsel provided ineffective assistance by not properly investigating Stephens or seeking a continuance in order to investigate Stephens after his late disclosure as a witness.

The petitioner's first argument relating to trial counsel's investigation of Stephens is that had trial counsel properly investigated Stephens, he would have discovered Stephens' sentence modification on his own. Our conclusion in part I of this opinion is dispositive of this aspect of the petitioner's ineffective assistance of counsel claim. "[T]he standard for proving *Strickland*'s second prong of an ineffective assistance of counsel claim is equivalent to the standard of materiality encompassed in a *Brady* claim; see *Kyles* v. [*Whitley*], 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) . . . ." *Quintana* v. *Commissioner of Correction*, 55 Conn. App. 426, 447, 739 A.2d 701, cert. denied, 252 Conn. 904, 743 A.2d 614 (1999). Because we concluded in part I of this opinion that evidence of Stephens' sentence modification was not material under *Brady*, we likewise conclude that trial counsel's failure to discover that evidence through his own investigation was not prejudicial to the petitioner. Thus, the petitioner's ineffective assistance of counsel claim fails in this regard.

The petitioner's next claim relating to trial counsel's investigation of Stephens is that, had trial counsel properly investigated Stephens, he would have discovered a witness, Sydney L. Cooper, Jr., who could have impeached Stephens' character. At the petitioner's habeas trial, the petitioner presented testimony from Cooper, an individual who had known Stephens for

many years. Cooper testified that Stephens' reputation in the community for telling the truth "wasn't good" and that he did not like Stephens due to prior altercations between Stephens and Cooper and between Stephens and Cooper's brother. Cooper also testified that he believed Stephens was "a liar" and that he "cheats, he steals and more." Additionally, Cooper testified that he had multiple felony convictions and would not have volunteered to testify if he was aware of the petitioner's criminal trial. At the conclusion of the habeas trial, the court found that the petitioner had failed to demonstrate that trial counsel's performance was deficient, and that, even if there had been any deficient performance, the petitioner failed to demonstrate a reasonable probability that such deficiency affected the outcome of the proceedings. The petitioner claims that the habeas court improperly concluded that trial counsel's failure to present testimony from Cooper did not amount to ineffective assistance of counsel.

"While it is incumbent on a trial counsel to conduct a prompt investigation of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction . . . counsel need not track down each and every lead or personally investigate every evidentiary possibility. . . . In a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation, but by demonstrable realities. . . . One cannot successfully attack, with the advantage of hindsight, a trial counsel's trial choices and strategies that otherwise constitutionally comport with the standards of competence." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 125 Conn. App. 97, 109–10, 7 A.3d 395 (2010).

Assuming, without deciding, that trial counsel's failure to discover Cooper constituted deficient performance, we conclude that the petitioner has not

demonstrated a reasonable probability that, had trial counsel further investigated Stephens and discovered Cooper, the outcome of the proceedings would have been different. First, Cooper testified specifically that he would not have volunteered to testify in the petitioner's criminal trial. Moreover, Cooper testified that he believed that Stephens did not have a good reputation in the community, but he also testified that his opinion of Stephens was based, at least in part, on his own personal animosity toward Stephens due to prior altercations. Furthermore, Cooper testified that he had multiple felony convictions, which, as the habeas court aptly noted, called into question his own veracity if he were to testify. Thus, in light of these questions regarding Cooper's own character for truthfulness, the likely impeachment value of Cooper's testimony was low. On this record, we conclude that the petitioner has failed to demonstrate a reasonable probability that, but for trial counsel's failure to locate and offer the testimony of Cooper, the outcome of the proceedings would have been different.

## B

The petitioner also alleges that the habeas court improperly failed to conclude that trial counsel was ineffective for failing to seek a hearing on an alleged violation of the court's sequestration order. The following additional facts are relevant to the petitioner's claim. On the first day of trial, January 22, 2002, following the testimony of Stephens' mother, one of the victims, the court entered a sequestration order mandating that "any witnesses in the case cannot be present when another witness is testifying, and so they have to be outside of the court." Three days after the court entered the sequestration order, Stephens testified during the state's direct examination as follows:

"Q. Did you initially want to testify?

"A. No, sir.

"Q. But you are testifying, now, because we brought you here, regardless.

"A. Yes. Well, actually, my mom came and visited me, and I spoke to her, and she, you know, she was pretty upset about it. And she said—she was, she was, she was upset because she said, you all really didn't question her more, and she didn't even get to finish—"

The petitioner's trial counsel then objected. The court sustained the objection and ordered Stephens' answer stricken. The petitioner now claims that Stephens' statement amounted to an admission that he had violated the court's sequestration order by speaking to his mother concerning her trial testimony, and that by failing to seek a hearing to determine if Stephens had in fact violated the sequestration order, trial counsel's performance was deficient. Moreover, the petitioner contends that he was prejudiced by this deficiency because, had trial counsel sought a hearing, it is "possible that [Stephens'] testimony may have been excluded . . . ." We are not persuaded.

The petitioner has offered no evidence to demonstrate how trial counsel's failure to seek a hearing on the sequestration order prejudiced him, short of asserting that it was "possible" that had trial counsel sought such a hearing, Stephens' testimony "may" have been excluded. It is well established that, in a claim of ineffective assistance of counsel, "[m]ere conjecture and speculation are not enough to support a showing of prejudice." (Internal quotation marks omitted.) *Floyd* v. *Commissioner of Correction*, 99 Conn. App. 526, 532, 914 A.2d 1049, cert. denied, 282 Conn. 905, 920 A.2d 308 (2007). Because the petitioner has offered no evidence that trial counsel's failure to seek a hearing prejudiced him, his claim that trial counsel was ineffective in this regard must fail.

## C

The next aspect of the petitioner's ineffective assistance of trial counsel claim alleges that the habeas court improperly failed to conclude that trial counsel rendered ineffective assistance for failing to object to certain portions of Stephens' testimony on hearsay grounds. The petitioner's claim relates to portions of the following testimony from Stephens elicited during the state's direct examination: "Well, the following day, the following morning . . . I saw [Eddie] Fryer [the petitioner's brother] on Barber and Cleveland, and we exchanged a couple of words. *He said, I can't get you, so I know where your mom lives [at] and I'm going there tonight.*" The petitioner claims that Stephens' testimony regarding Fryer's out-of-court statements constituted hearsay and that by failing to object to this testimony, trial counsel's representation was deficient under the first prong of *Strickland*. The petitioner claims that because Stephens' testimony regarding Fryer's statements provided crucial evidence of motive, he was prejudiced by counsel's deficient performance under the second prong of *Strickland*. Assuming, without deciding, that counsel's failure to object to this testimony constituted deficient performance under the first prong of *Strickland*, we conclude that the petitioner has failed to establish that he was prejudiced by this deficiency.

The evidentiary importance of the hearsay portions of Stephens' testimony is best understood in light of the other evidence before the jury regarding the interactions of the petitioner, Stephens, Fryer and Hughes. The jury heard the following evidence relating to the relationship between these individuals. Stephens was the son of one of the victims and the brother of another one of the victims. Fryer was the petitioner's brother, and Hughes was the petitioner's cousin. Stephens had lent his car to a group of individuals who used the car when robbing Hughes. In addition to Fryer's hearsay

statement regarding his knowledge of where Stephens' mother lived, Stephens also testified that he believed that Fryer knew where his mother lived. Thus, the petitioner alleges that this evidence, when coupled with the hearsay testimony of Fryer's threat, allowed the jury to infer that the shooting and attempted arson of the victims' home was retaliation for the robbery of Hughes, thus providing evidence as to motive.

Although we agree that the statement of the petitioner's brother, Fryer, specifically threatening that, because he could not get Stephens he was going after Stephens' family, i.e., the victims, was damaging, we do not agree that, considering the totality of the evidence, trial counsel's failure to object to this testimony affected the outcome of the trial. Even if trial counsel had objected and the evidence of Fryer's statement had been excluded, the jury nonetheless had before it ample evidence of motive. The jury had evidence of the relationship between the parties and the fact that the son of one of the victims had recently been involved in robbing the petitioner's cousin. Thus, although the evidence as to motive was bolstered by evidence of Fryer's threat, even if this evidence was excluded, the jury still had evidence from which the same motive could be inferred.[1] Moreover, examining the totality of the evidence before the jury, we cannot say that had trial counsel objected to the hearsay portion of Stephens' testimony, the fact finder would have had a reasonable doubt as to the petitioner's guilt. Therefore, the petitioner's ineffective assistance of counsel claim fails in this regard.

## D

The final aspect of the petitioner's ineffective assistance of trial counsel claim relates to his trial counsel's

---

[1] It is worth noting that "motive is not an element of a crime that the state has the burden of proving, [but] the presence of evidence of motive may strengthen the state's case." *State* v. *Pinnock*, 220 Conn. 765, 773, 601 A.2d 521 (1992).

failure to file motions in limine to preclude certain incriminating evidence. The petitioner claims that his trial counsel failed to file a motion in limine to preclude evidence of a .22 caliber bullet found in his home, as well as evidence of a .38 caliber handgun found on the Berlin Turnpike.[2] We decline to review these claims because they were not raised in the petition for a writ of habeas corpus or addressed by the habeas court in its memorandum of decision.

"It is well settled that [t]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . The principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint. . . . While the habeas court has considerable discretion to frame a remedy that is commensurate with the scope of the established constitutional violations . . . it does not have the discretion to look beyond the pleadings and trial evidence to decide claims not raised. . . . This court is not bound to consider claimed errors unless it appears on the record that the question was distinctly raised . . . and was ruled upon and decided by the court adversely to the appellant's claim. . . . To review [the claim] now would amount to an ambuscade of the [habeas] judge. . . . This court is not compelled

---

[2] At the petitioner's criminal trial, the state offered evidence relating to a .38 caliber handgun that was found by a cleanup crew along the Berlin Turnpike. The state offered testimony that the gun was found along the route that the petitioner and the other suspects took during the police chase. The state also offered testimony that the bullets in the gun were of a similar caliber and type as those found at the crime scene. At this point, the petitioner's trial counsel objected. The court ultimately sustained the petitioner's trial counsel's objection and excluded evidence relating to the gun. The court instructed the jury to disregard the evidence relating to the gun. On appeal, the petitioner contends that trial counsel was nonetheless ineffective for not filing a motion in limine to preclude any evidence of the gun before the jury heard testimony regarding it.

to consider issues neither alleged in the habeas petition nor considered at the habeas proceeding . . . ." (Citation omitted; internal quotation marks omitted.) *Satchwell* v. *Commissioner of Correction*, 119 Conn. App. 614, 619, 988 A.2d 907, cert. denied, 296 Conn. 901, 991 A.2d 1103 (2010).

In count four, paragraphs twenty-eight through thirty of the petitioner's amended petition for a writ of habeas corpus, the petitioner alleges that trial counsel was ineffective for: failing to "conduct an investigation into the reliability of the state's gun evidence"; failing to "consult with an expert concerning the state's gun evidence"; and failing to "call an expert to testify to the reliability of the state's gun evidence." These counts do not allege that counsel was ineffective for failing to file a motion in limine to preclude the gun evidence prior to trial. Additionally, none of the counts alleges that counsel was ineffective for failing to file a motion in limine to preclude evidence of the .22 caliber bullet found in the petitioner's home. Moreover, the habeas court did not address either of these issues in its memorandum of decision. The petitioner's claims on appeal regarding the gun evidence are materially different from the claims raised in the petition for a writ of habeas corpus and ruled upon by the habeas court. Accordingly, because the petitioner's claims were not distinctly raised in his petition for a writ of habeas corpus or addressed by the habeas court in its memorandum of decision, we decline to review these claims on appeal.

The judgment is affirmed.

In this opinion the other judges concurred.