******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# LUIS DIAZ *v.* COMMISSIONER OF CORRECTION
## (AC 39134)

Lavine, Keller and Pellegrino, Js.

*Syllabus*

The petitioner, who had been convicted of murder and firearm offenses in connection with a shooting incident in Bridgeport, sought a writ of habeas corpus, claiming, inter alia, that the habeas court abused its discretion in denying his petition for certification to appeal because his right to due process and a fair trial were violated by the prosecutor's failure to disclose material evidence that was favorable to the defense as required by *Brady* v. *Maryland* (373 U.S. 83). During the petitioner's criminal trial, several witnesses, including O, gave testimony implicating the petitioner in the shooting. Specifically, O, who was incarcerated at the time of the petitioner's trial, testified that he had observed the petitioner shoot the victim. The habeas court rendered judgment denying the petition. Thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Held*:

1. The petitioner failed to demonstrate that the habeas court abused its discretion in denying the petition for certification to appeal with respect to the petitioner's claim that his right to due process and a fair trial were violated by the prosecutor's failure to disclose material evidence that was favorable to the defense, namely, that an express or implied agreement existed between the state and O, in exchange for O's testimony at the petitioner's criminal trial; the petitioner's claim to the contrary notwithstanding, the habeas court focused on the claim as framed by the petitioner's amended petition, and did not limit its analysis to the existence of a written or formal agreement between the state and O, or the existence of a plea agreement, as the court referred to the lack of any "undisclosed understandings" or "clandestine plea arrangements," and the fact that "no deals were struck" between the state and O, and the circumstantial evidence, including the fact that, several months after O testified for the state at the petitioner's criminal trial, the state agreed that O's sentence modification agreement should be considered by the sentencing court, did not compel a finding that, prior to the petitioner's criminal trial, the state and O had come to an understanding that required disclosure under *Brady*, because the testimony of both S, the senior assistant state's attorney who prosecuted the petitioner in his underlying criminal trial, and O was consistent in their denial that, prior to the petitioner's trial, any agreement had been reached or that any quid pro quo existed other than that which was disclosed to the jury at the petitioner's criminal trial, namely, that O hoped that the state would make O's cooperation known in the future; moreover, any evidence that S was motivated to acquiesce in O's sentence modification application following the petitioner's trial did not implicate a duty to disclose under *Brady* at the time of trial; furthermore, this court did not consider the petitioner's alternative claims that the state solicited O's false testimony that no agreement had made with the state and that the state failed to correct that false testimony because those claims were not distinctly raised before the habeas court and the court did not consider those claims in denying the petition for a writ of habeas corpus.

2. The petitioner failed to demonstrate that the habeas court abused its discretion in denying the petition for certification to appeal with respect to the petitioner's claim that counsel in the prior habeas proceeding rendered ineffective assistance because they failed to identify, understand, research, raise, or argue the *Brady* claim concerning O: even if the petitioner could demonstrate that counsel performed deficiently with respect to the *Brady* claim concerning O, the habeas court properly determined that the petitioner was unable to demonstrate that he was prejudiced by counsel's performance because no *Brady* violation occurred.

Argued March 7—officially released July 18, 2017

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J.)

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, and tried to the court, *Sferrazza, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*James E. Mortimer*, for the appellant (petitioner).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, was *John Smriga*, state's attorney, and *Craig Nowak*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

KELLER, J. The petitioner, Luis Diaz, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. First, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal because his right to due process and a fair trial were violated by the prosecutor's failure to disclose material evidence that was favorable to the defense, namely, that an express or implied agreement existed between the state and one of the state's witnesses, Eddie Ortiz, in exchange for Ortiz' testimony at the petitioner's criminal trial. In connection with this claim, the petitioner also claims that the state failed to correct false testimony provided by Ortiz concerning the existence of such an agreement. Second, the petitioner claims that his right to the effective assistance of counsel was violated by virtue of representation afforded to him by counsel in a prior habeas proceeding. The petitioner claims that prior habeas counsel failed to adequately pursue his claim that his right to due process was violated by the state's failure to disclose an agreement reached with Ortiz prior to the petitioner's trial. Because we conclude that the court's denial of the petition for certification to appeal reflected a proper exercise of its discretion, we dismiss the appeal.

The following underlying facts and procedural history are relevant to the present appeal. In 2007, following a jury trial, the petitioner was convicted of murder in violation of General Statutes § 53a-54a, carrying a pistol without a permit in violation of General Statutes § 29-35, and criminal possession of a pistol in violation of General Statutes § 53a-217c. The petitioner was sentenced to a total effective term of incarceration of seventy years. Following the petitioner's direct appeal to our Supreme Court pursuant to General Statutes § 51-199 (b) (3), that court affirmed the judgment of conviction. *State* v. *Diaz*, 302 Conn. 93, 25 A.3d 594 (2011).

Our Supreme Court set forth the following facts underlying the petitioner's conviction: "On the evening of January 11, 2006, the victim, Philip Tate, was shot and killed outside a bar known as the Side Effect West in the city of Bridgeport. Thereafter, the [petitioner] was arrested and charged with murdering the victim, carrying a pistol without a permit and criminal possession of a pistol or revolver.

"In March, 2006, Corey McIntosh gave a statement to the police indicating that the [petitioner] had been the shooter. At that time, McIntosh was on federal probation and had received a three year suspended sentence for possessing narcotics in Connecticut. McIntosh testified at the [petitioner's] trial that he had seen the [petitioner] outside the Side Effect West immediately

before the shooting and had heard shots as he entered the bar. He then ran out the back door and saw the [petitioner] running down the street with a gun in his hand. Additional state narcotics charges were pending against McIntosh at the time of trial. He testified that, while no promises had been made in connection with the pending charges, he was hoping to receive some consideration in exchange for his testimony.

"At some point after July, 2006, Eddie Ortiz wrote a letter to the prosecutor's office indicating that he had information about the murder. He was incarcerated at the time and stated in his letter that he was looking for some consideration in exchange for his testimony. Ortiz testified at the [petitioner's] trial that he had seen the [petitioner] shoot the victim. He also testified that, during the trial, he had been placed in the same holding cell as the [petitioner], who said to him, 'You know what I did' and 'I know where you live at.' In addition, Ortiz testified that the [petitioner] had offered him $5000 not to testify. He further testified that the prosecutor's office had not promised him anything in exchange for his testimony and that he had been told that it would be up to a judge whether he would receive any benefit, such as a sentence modification. He had expectations, however, that his testimony would be taken into consideration.

"Approximately six months after the murder, James Jefferson asked his attorney to inform Harold Dimbo, a detective with the Bridgeport [P]olice [D]epartment, that Jefferson had information about the murder. Jefferson, who was incarcerated in Connecticut on domestic violence charges at the time, was subject to lifetime parole in New York in connection with a conviction on narcotics charges in that state. Dimbo visited Jefferson in prison and Jefferson agreed to give a statement about the shooting. Dimbo made no promises to Jefferson. In September, 2006, the domestic violence charges were dismissed for lack of evidence. Thereafter, Jefferson testified at the [petitioner's] trial that he had seen the [petitioner] and the victim outside Side Effect West immediately before the shooting. He also saw the [petitioner] shoot at someone, but he did not see the victim at that point. At the time of trial, Jefferson was incarcerated in Connecticut for violating his parole in New York.

"McIntosh, Ortiz and Jefferson were the only witnesses who identified or implicated the [petitioner] as the shooter. The [petitioner's] girlfriend, Shenisha McPhearson, testified that the [petitioner] had been with her at her apartment at the time of the shooting. The state presented no physical evidence to tie the [petitioner] to the shooting and the gun used in the shooting was never recovered." (Footnote omitted.) Id., 95–97.

In a prior habeas corpus proceeding, in which the petitioner was represented by Attorneys William T.

Koch, Jr., and W. Theodore Koch III, the habeas court denied the petitioner relief on May 16, 2012. After the habeas court denied the petitioner's petition for certification to appeal from that judgment, the petitioner appealed to this court, which dismissed the appeal. *Diaz* v. *Commissioner of Correction*, 152 Conn. App. 669, 100 A.3d 856, cert. denied, 314 Conn. 937, 102 A.3d 1114 (2014).

In the present action, on June 7, 2013, the petitioner filed a petition for a writ of habeas corpus. On February 9, 2015, the petitioner filed a three count amended petition. In count one, he alleged that prior habeas counsel rendered ineffective assistance in ten different ways. In count two, the petitioner alleged that his right to due process was violated because the prosecutor failed to disclose evidence that was favorable to the defense "with respect to an express or implied agreement" with state's witnesses Ortiz, McIntosh, and Jefferson. In count three, the petitioner, referring to evidence that he alleged to have discovered following his conviction, claimed that he was actually innocent of the charges underlying his conviction and incarceration. During the trial, the petitioner withdrew the third count of the petition.

In his return, the respondent, the Commissioner of Correction, denied the substantive allegations set forth in each count of the petition. By way of special defenses, the respondent alleged that the claims set forth in count two were barred by the doctrines of successive petition and abuse of the writ because the claims either were previously litigated in the prior habeas proceeding or the petitioner had a full and fair opportunity to litigate such claims in that prior proceeding. Alternatively, the respondent alleged that the claims set forth in count two were barred by the doctrine of procedural default because the petitioner failed to raise such claims in the prior habeas proceeding. In reply, the petitioner denied the respondent's special defenses.

A trial before the habeas court took place on August 18, 2015, and October 22, 2015. In addition to receiving evidence that was nontestimonial in nature, the court heard testimony from Donald Collimore, an assistant state's attorney who prosecuted charges against McIntosh, beginning in 2006; Brian Kennedy, an assistant state's attorney who, at Collimore's direction, entered a nolle prosequi in McIntosh's prosecution; W. Theodore Koch III, who represented the petitioner in his prior habeas appeal; Howard Stein, a senior assistant state's attorney who prosecuted the petitioner in the criminal case underlying the present action; Ortiz; and Jefferson. Later, the petitioner and the respondent submitted post-trial briefs to the court.

In its memorandum of decision denying the amended petition, the court stated: "In the present action, the petitioner alleges, in the first count, that his previous

habeas counsel . . . rendered ineffective assistance and, in the second count, that his due process rights as enunciated in *Brady* v. *Maryland*, [373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)], were breached."

First, the court addressed the merits of the petitioner's *Brady* claim. In relevant part, the court stated: "The petitioner asserts that three prosecution witnesses, viz. . . . Ortiz . . . McIntosh, and . . . Jefferson, were offered secret plea dispositions regarding their own criminal files in exchange for their testimony against the petitioner at his criminal trial in 2007. During the present habeas hearing . . . Collimore . . . Kennedy . . . Stein . . . Ortiz . . . and . . . Jefferson . . . all testified that no such undisclosed understandings existed at the time their cases and the petitioner's criminal case were pending. [Koch] . . . also testified that he discovered no evidence supporting such clandestine plea arrangements when he represented the petitioner in his previous habeas case. No credible evidence was adduced during the present hearing to support these assertions of *Brady* violations nor attacking the credibility of the above listed witness' testimony to the contrary.

"Although certain favorable plea negotiations occurred with respect to Ortiz, McIntosh, and Jefferson sometime *after* the petitioner's criminal trial concluded, the court finds that no deals were struck between any of these witnesses and the prosecution in exchange for their testimony [at the petitioner's criminal trial]. Indeed, because Jefferson and McIntosh had given written statements to the police implicating the petitioner as the shooter *shortly after* the homicide, the prosecutor handling the petitioner's case had no pressing need to proffer promises to these witnesses because of the holding of *State* v. *Whelan*, 200 Conn. 743, 753 [513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598] (1986).

"Therefore, the court determines that the petitioner has failed to prove the factual underpinnings of his *Brady* violation claim, and the court denies the amended petition as to the second count." (Emphasis in original.)

Discussing the merits of the first count of the petition, alleging ineffective assistance of prior habeas counsel, the court began its analysis by setting forth relevant principles of law. The court observed that the petitioner had "a herculean task" of demonstrating that he was prejudiced by the deficient performance of prior habeas counsel and trial counsel. (Internal quotation marks omitted.) Then, the court stated: "[T]he petitioner avers that his previous habeas counsel were professionally deficient by failing to discover and present evidence, in a variety of forms, as to the existence of implied plea agreements between the state and Ortiz, McIntosh, and Jefferson; by misadvising the petitioner with respect to

the availability of sentence review; by failing to assert an ineffective assistance claim against appellate counsel . . . for her failure to lay a proper foundation for a *Brady* violation argument through rectification of the trial records; and by failing to present expert witnesses regarding the purported insufficiencies of trial and appellate counsel. . . .

"This court's factual findings that no *Brady* violation occurred, as elucidated above, also requires the court to deny habeas relief with respect to ineffective assistance premised on the existence of such violations. . . .

"Per stipulation between the litigants, the petitioner's opportunity for sentence review was restored. Therefore, this claim of ineffective assistance has been dealt with previously. . . .

"The final specification against habeas counsel is that they failed to engage legal experts to evaluate and testify as to the deficient performance of trial and/or appellate counsel. However, in this *present* habeas case, the petitioner also presented no such expert witnesses with respect to trial counsel, appellate counsel, or previous habeas counsel. Consequently, this averment lacks any factual foundation whatsoever. [This] court would be left to speculate as to whether such expert testimony would have been available [to prior trial, appellate, and habeas counsel], and as to the substance of such supposed testimony. It is incumbent upon the petitioner to establish the ways in which defense counsel's failure to present a witness negatively affected the pertinent proceeding . . . . Therefore, this allegation of ineffective assistance fails." (Citation omitted; emphasis in original.) Subsequent to its denial of the petition for a writ of habeas corpus,[1] the court denied a petition for certification to appeal filed by the petitioner.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . .

"To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification,

we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Citation omitted; internal quotation marks omitted.) *James* v. *Commissioner of Correction*, 170 Conn. App. 800, 807–808, 156 A.3d 89 (2017).

In evaluating the merits of the underlying claims on which the petitioner relies in the present appeal, we observe that "[when] the legal conclusions of the court are challenged, [the reviewing court] must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . . [A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Brewer* v. *Commissioner of Correction*, 162 Conn. App. 8, 13, 130 A.3d 882 (2015).

I

First, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal because his right to due process and a fair trial were violated by the prosecutor's failure to disclose material evidence that was favorable to the defense, namely, that an express or implied agreement existed between the state and Ortiz in exchange for Ortiz' testimony at the petitioner's criminal trial. In connection with this claim, the petitioner also claims that the state failed to correct false testimony provided by Ortiz concerning the existence of such an agreement. We disagree that the court abused its discretion in denying the petition for certification to appeal on this ground.

As stated previously in this opinion, the petitioner alleged that, at his criminal trial, the state violated *Brady* in that it "failed to disclose material favorable evidence to the petitioner with respect to an express or implied agreement with the state's witness . . . Ortiz." In support of this aspect of his claim, the petitioner alleged the following specific facts: (1) "[o]n July 12, 2006 . . . Ortiz was convicted of robbery in the first degree and sentenced to eight years [of] incarceration"; (2) "[a]t the petitioner's criminal trial . . . Ortiz testified that he witnessed the petitioner murder . . . Tate and that the petitioner had attempted to bribe him not to testify"; (3) "[a]fter testifying at the petitioner's criminal trial . . . Ortiz' sentence was modified to three years"; (4) "Ortiz testified at the petitioner's criminal trial that he was promised no consideration. Furthermore . . . Stein stated in the state's closing argument that . . . Ortiz was told that he would get

no benefit in exchange for his testimony"; and (5) "[w]hen . . . Ortiz testified at the petitioner's criminal trial, an undisclosed express or implied agreement that the state would concur with his sentence modification application in exchange for his favorable testimony existed, in violation of the petitioner's constitutional rights."

As detailed previously in this opinion, the court rejected the petitioner's assertion that any "clandestine plea arrangement" or "undisclosed understandings" existed between the state and the witnesses at issue in the petition, including Ortiz, at the time that the cases of the petitioner and Ortiz were pending. The court found that "[n]o credible evidence was adduced during the present hearing to support . . . assertions of *Brady* violations . . . ." The court found that "no deals were struck" between the witnesses at issue, including Ortiz, and the prosecution in exchange for their testimony.

The petitioner argues that "the habeas court entirely misunderstood the nature of the petitioner's claim concerning Ortiz. . . . The petitioner did not assert that Ortiz was offered secret plea dispositions regarding [Ortiz'] own criminal file in exchange for [his] testimony . . . . Rather, the gravamen of the petitioner's complaint, as advanced through his pleadings, his pretrial brief, through the questioning of witnesses, his posttrial brief, and now on appeal, is that the prosecuting authority explicitly or implicitly promised Ortiz consideration, in the form of a promise of acquiescence to a sentence modification application, prior to his testimony. Further, the petitioner argued that the prosecuting authority's advancement of Ortiz' testimony concerning the same was false and misleading and stood uncorrected." (Citations omitted; internal quotation marks omitted.)

The petitioner argues that the evidence presented at the habeas trial "demonstrated [that] the state extended a pretestimonial offer of consideration to Ortiz for a more favorable outcome in his criminal case in exchange for his testimony at the petitioner's criminal trial. The agreement the petitioner finds fault with arose by virtue of the state's implied promise of acquiescence to Ortiz' *sentence modification application*." (Emphasis in original.)

The petitioner draws our attention to Ortiz' testimony during the habeas trial that when he wrote to the prosecutor's office in 2006, after he received an eight year sentence of incarceration for robbery in the first degree, he hoped that by coming forward to testify against the petitioner he could "get out early."[2] Ortiz testified that, when he met with Stein prior to testifying, a topic of conversation was how his sentence could be changed, and that he learned that the only person that could change his sentence was a judge. Ortiz testified, however, that "there was nothing promised." Ortiz testified

that Stein told him that he would be willing to make his participation in the petitioner's criminal trial known, but that Stein did not specify to whom he would make it known. Ortiz testified, as well, that, after he testified against the petitioner, he contacted a public defender, Attorney Joseph Bruckmann, for assistance because he was "being threatened" in jail. He testified that, ultimately, his sentence was reduced by five years.

The petitioner also draws our attention to Stein's testimony. Stein testified that when he met with Ortiz initially, Ortiz requested consideration for his testimony. Stein testified, however, that the state did not offer Ortiz any consideration in exchange for his testimony. Stein testified: "[Ortiz] was not a necessary witness and . . . I explained to him that there would be no consideration. I did explain to him that if he did testify, if he did the right thing, that if he felt that that had value in the future somehow and he wanted me to affirm that to somebody, whoever that might be, that I would be happy to do that, to affirm the fact that he testified, but that there was no consideration, no accommodation to sentence, just that I would state the affirmative, that he testified as a state's witness in a homicide case." Stein acknowledged that "there are many ways for a state's attorney to acknowledge a person's cooperation," and that these ways did not necessarily relate to sentence modification. Stein testified that "[s]entence modifications were not discussed," but he told Ortiz that he would be willing to make a formal acknowledgement of Ortiz' cooperation with the state to any party, including a judge. Stein testified that, after he spoke with Ortiz, he believed that he would be an effective witness for the state.

In attempting to demonstrate the existence of an agreement concerning Ortiz' application for sentence modification, the petitioner refers to Stein's testimony that, in fact, he was aware that Ortiz, who had been sentenced to a term of incarceration of more than three years, could not have such application considered by the court without the approval of the state's attorney. See General Statutes § 53a-39 (b).[3] Yet, Stein testified that he did not represent to Ortiz that he would agree to support a sentence review application if Ortiz sought to pursue such a remedy. Stein testified that following Ortiz' testimony, on August 9, 2007, he "signed off" on a sentence review application that was filed on Ortiz' behalf. Stein testified that his decision regarding the application was made only after he had learned that Ortiz was being threatened in jail by the petitioner and others on behalf of the petitioner, and that Ortiz had sought the assistance of Bruckmann. Stein testified that Bruckmann related that information to him and filed the application on Ortiz' behalf. Stein testified that, subsequently, he received a letter from Ortiz, which was admitted in evidence, in which Ortiz thanked him for keeping his "promise." Stein testified that it was

only after he learned from Bruckmann that Ortiz' life was in danger as a consequence of his testimony against the petitioner that he indicated to Bruckmann that he would concur in the sentence modification application so that Ortiz could appear before the court. Stein testified that, in referring to a promise, Ortiz may have been referring to what Stein told him during his initial meeting with him, when he informed Ortiz that he would acknowledge the fact that he had testified against the petitioner on behalf of the state.[4] Stein testified as to his belief that Ortiz' letter was not evidence that any type of deal had been made with him to secure his testimony.

The evidence was undisputed that Ortiz testified against the petitioner in April of 2007. Transcripts from the petitioner's criminal trial, admitted in evidence, reflect that, during his direct examination by Stein for the state, Ortiz testified that the topic of sentence modification had not been discussed with him previously and that "no promises" were made to him in exchange for his testimony. With respect to Ortiz' expectations, the following relevant examination of Ortiz by Stein transpired at the petitioner's criminal trial:

"Q. So basically you were told that . . . it's expected you would cooperate. And what, if anything, came from it was up to a judge one day to decide if it had any value?

"A. Yes, sir.

"Q. And you were promised nothing?

"A. Yes, sir.

"Q. Certainly, do you have expectations or would you hope that someone would take this into consideration?

"A. Yes, sir.

"Q. But other than that, you're here with no promises and no consideration?

"A. Yes, sir."

Later, Stein inquired of Ortiz, as follows:

"Q. As you sit here today, do you have any expectations that you will receive any favorable treatment for your testimony here today?

"A. Yes, sir.

"Q. And with that, do you expect that there's some type of a preset thing that's going to happen, or you're just hoping someone will take this into consideration?

"A. Hoping someone will take it into consideration.

"Q. But as you sit here now, you have absolutely no promise or any deals that have been set in exchange for your testimony?

"A. Yes, sir."

Ortiz also testified with respect to his belief that the

state's attorney was "not capable of promising [him] anything" in relation to his previously imposed eight year sentence. During cross-examination, Ortiz reiterated that he had not been offered any consideration, but stated that, in contacting the state's attorney, he was looking for some type of an accommodation with respect to his sentence.

During closing arguments at the petitioner's criminal trial, defense counsel pointedly suggested that the evidence demonstrated that Ortiz' testimony was not credible, but was motivated by his desire to receive a lesser sentence. Defense counsel referred to Ortiz as "the classic example of the savvy lifetime criminal," and in relevant part stated that the jury should "not . . . believe that Ortiz was at the scene of the shooting that night and that he is just providing us with what he thinks the state would want to hear . . . to get some accommodation on his sentence . . . ." Stein referred to Ortiz' testimony. Then, in an attempt to cast doubt on defense counsel's argument that Ortiz' testimony was motivated by self-interest, he argued in relevant part: "How cold a person do you have to be to point an accusatory finger and say I saw this man commit murder when you're doing it for your own motivation? How cold do you have to be? What is the benefit that would cause a person to be that cold? [He] ha[s] been promised nothing. Flat out told you [that he] get[s] no benefit. It's expected that [he] would cooperate as a good citizen and a good person."

The petitioner presented undisputed evidence that the court granted the sentence modification application on September 6, 2007.[5] A transcript of the August 20, 2007 hearing on the sentence modification application was admitted in evidence. At the hearing, Stein referred to his discussions with Bruckmann that preceded the application for sentence review. Stein, referring to his posttrial "agreement" with Ortiz to acquiesce in the application for sentence review, represented to the court that his "agreement with Ortiz . . . was that [Stein] would not object to the modification and then [he] would leave them on their merits with . . . Bruckmann and . . . Ortiz to convince this court as to what, if any, the appropriate modification should be." In support of the application, Bruckmann represented that Ortiz had told him that he was being threatened in jail, he was labeled as "a snitch," and he was told that there was "a contract out for his life based on his testimony [against the petitioner]." Stein represented to the court that when he met with Ortiz prior to the petitioner's trial, he found Ortiz to be "extremely credible" and that he believed his testimony was "clearly influential" in terms of the conviction obtained by the state against the petitioner. Stein testified that during his pretrial meeting with Ortiz, Stein told him that he "was not in a position to promise him anything other than the fact that [he] would make known at the appropriate point

in time about the cooperation that [Ortiz] gave to the state with regard to the [petitioner's] homicide case, which is where we're at now, fulfilling [Stein's] agreement with . . . Ortiz." Stein testified that Ortiz had contacted him to let him know that he has been "facing continuous threats" as a result of his cooperation with the state.

On appeal, in challenging the court's findings of fact, the petitioner argues: "It is unquestionable—in light of the evidence presented to the habeas court—that Ortiz was looking for consideration when he first wrote to the state. Secondly, it is unquestionable that the prosecuting authority promised Ortiz to make his cooperation known prior to testifying, be it to a judge or another person. Thirdly, it is unquestionable that Stein recognized Ortiz' status as a sentenced prisoner at the time that this promise was made. Fourthly, it is unquestionable that, at the petitioner's trial, Ortiz testified that it was his understanding that only a judge could effectuate a change upon his sentence. Fifthly, it cannot reasonably be disputed that the only reasonable means for Stein's acknowledgement of cooperation to a judge to have any conceivable effect on Ortiz' sentence is by means of a sentence modification hearing.[6] Sixthly, the passage of time between the conclusion of the petitioner's criminal proceedings and Ortiz' sentence modification cannot be disputed. Seventhly, it cannot be disputed that, despite Ortiz' sentence modification application being predicated upon 'threats,' Ortiz never sought protective custody while incarcerated. Finally, it is undisputable that the state's acquiescence was necessary for a judge to hear Ortiz' application for a sentence modification, as Ortiz' sentence exceeded three years." (Footnote in original.)

Having discussed relevant evidence before the court, we turn to some principles of law applicable to claims of this nature. "[T]he law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. . . .

"It is well established that [i]mpeachment evidence as well as exculpatory evidence [fall] within *Brady*'s definition of evidence favorable to an accused. . . . [An express or implied] plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady* . . . .

"The [United States] Supreme Court established a

framework for the application of *Brady* to witness plea agreements in *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). . . . Drawing from these cases, this court has stated: [D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . .

"The prerequisite of any claim under the *Brady*, *Napue* and *Giglio* line of cases is the existence of an undisclosed agreement or understanding between the cooperating witness and the state. . . . Normally, this is a fact based claim to be determined by the trial court, subject only to review for clear error." (Citations omitted; internal quotation marks omitted.) *State* v. *Ouellette*, 295 Conn. 173, 185–87, 989 A.2d 1048 (2010).

"[T]he jury's estimate of the truthfulness and reliability of a . . . witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . . Accordingly, the *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . . . Because a plea agreement is likely to bear on the motivation of a witness who has agreed to testify for the state, such agreements are potential impeachment evidence that the state must disclose. . . .

"Not every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . . . In a classic *Brady* case, involving the state's inadvertent failure to disclose favorable evidence, the evidence will be deemed material only if

there would be a reasonable probability of a different result if the evidence had been disclosed. [The] . . . touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. . . .

"When . . . a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, the materiality standard is significantly more favorable to the defendant. [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . This standard . . . applies whether the state solicited the false testimony or allowed it to go uncorrected . . . and is not substantively different from the test that permits the state to avoid having a conviction set aside, notwithstanding a violation of constitutional magnitude, upon a showing that the violation was harmless beyond a reasonable doubt. . . . This strict standard of materiality is appropriate in such cases not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process. . . . In light of this corrupting effect, and because the state's use of false testimony is fundamentally unfair, prejudice sufficient to satisfy the materiality standard is readily shown . . . such that reversal is virtually automatic . . . unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369–73, 71 A.3d 512 (2013).

Our Supreme Court has recognized that evidence that merely *suggests* an informal understanding between the state and a state's witness may constitute impeachment evidence for purposes of *Brady*. *State* v. *Floyd*, 253 Conn. 700, 740, 756 A.2d 799 (2000). Such evidence is by no means limited to the existence of plea agreements. "Any . . . understanding or agreement between any state's witness and the state police or the state's attorney clearly falls within the ambit of *Brady* principles. . . . An unexpressed intention by the state not to prosecute a witness does not. . . .

"The question of whether there existed an agreement between [a witness] and the state is a question of fact . . . . When reviewing the decision of a habeas court,

the facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . This court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . A petitioner bears the burden of proving the existence of an agreement between the state or police and a state's witness." (Citations omitted; internal quotation marks omitted.) *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 152–53, 10 A.3d 578, cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011).

The petitioner argues that the court's finding that no pretestimonial agreement existed was clearly erroneous and that "[t]he habeas court's findings should impress upon this court the definite conviction that a mistake has been committed." The petitioner correctly suggests that the evidence of what transpired between Stein and Ortiz generally is not in dispute. The import of that evidence, that is, whether it reflected the existence of an unwritten or informal understanding that implicated *Brady*, is highly disputed. That factual issue is at the heart of the petitioner's *Brady* claim.

As an initial matter, the petitioner argues that the court misinterpreted or failed to understand the import of his claim. The petitioner argues that the court focused solely on whether a plea agreement between Ortiz and the state existed, rather than on whether any agreement that would have benefitted Ortiz existed and, thus, reasonably might be viewed as motivating his testimony. The court's decision reflects otherwise. Despite its brevity, the court's opinion reflects that it did not limit its analysis to the existence of a written or formal agreement between Stein and Ortiz or the existence of a plea agreement. Instead, the court referred to the lack of any "*undisclosed understandings*," the lack of "clandestine plea arrangements," and the fact that "no deals were struck" between Stein and the witnesses at issue, including Ortiz. (Emphasis added.) Thus, it appears that the court focused on the claim as framed by the petitioner's amended petition.[7]

Essentially, the petitioner's disagreement with the court's findings of fact concerns the court's failure to interpret the evidence consistently with his allegations. The petitioner relies heavily on the timing of the events at issue and argues that it is circumstantial evidence

that compelled a finding that, prior to the petitioner's criminal trial, Stein and Ortiz had come to an understanding that merited disclosure under *Brady*. Ortiz received an eight year prison sentence. Ortiz testified for the state at the petitioner's criminal trial. Several months later, Stein agreed that Ortiz' sentence modification application should be considered by the sentencing court. Thereafter, the court granted Ortiz' application and reduced his sentence by five years.

In reaching its factual findings, the court had the opportunity to consider the testimony of Ortiz and Stein with respect to their conversations prior to the petitioner's trial. Both were consistent in their denial that, prior to the petitioner's trial, any agreement had been reached or that any quid pro quo existed beyond that which was unambiguously disclosed to the jury at the petitioner's criminal trial—that Ortiz, looking for some type of benefit, hoped that Stein would make his cooperation with the state known in the future, and that Stein agreed to confer no benefit to Ortiz beyond making his cooperation known.[8] The petitioner did not present evidence that Stein's promise to acknowledge Ortiz' cooperation either explicitly or implicitly conveyed that Stein would convey any benefit to Ortiz with respect to a sentence review application. The petitioner did not present evidence that compelled a finding that, prior to the petitioner's trial, Stein knew that he would give favorable treatment to Ortiz' sentence modification application or that Ortiz expected Stein to sign off on his application in exchange for his testimony. To the contrary, Stein testified that his decision to acquiesce in the application was based on communications that he had with Ortiz and Bruckmann, concerning Ortiz' well-being in prison, *following the petitioner's trial*. Cf. *Elsey* v. *Commissioner of Correction*, supra, 126 Conn. App. 155–57 (evidence that court modified sentence of state's witness two weeks prior to his testimony suggested existence of informal understanding between witness and state under second prong of *Brady*). The evidence that Stein was motivated to acquiesce in Ortiz' sentence modification application following the petitioner's trial did not implicate a duty to disclose under *Brady* at the time of trial.

The evidence amply supported the inferences that the court drew from it, and we are not persuaded that a mistake was committed. In the absence of a showing that any understanding existed with respect to sentence modification, as claimed by the petitioner, he is unable to demonstrate that it should have been disclosed under *Brady*.[9] For the foregoing reasons, we conclude that the petitioner has failed to demonstrate that the court abused its discretion in denying the petition for certification to appeal with respect to this claim.[10]

II

Second, the petitioner claims that his right to the

effective assistance of counsel was violated by virtue of representation afforded him by counsel in a prior habeas proceeding. The petitioner argues that prior counsel rendered ineffective assistance because they failed to identify, understand, research, raise, or argue the *Brady* claim analyzed in part I of this opinion. We disagree.

As stated previously, the habeas court determined that, in light of its finding that no *Brady* violations occurred, the petitioner was not entitled to relief with respect to the present claim. This analysis is sound. Even if the petitioner could demonstrate that counsel performed deficiently with respect to the *Brady* claim concerning Ortiz, our analysis set forth in part I of this opinion necessarily leads us to conclude that the court properly determined that the petitioner was unable to demonstrate that he was prejudiced by counsel's performance because no *Brady* violation occurred. See *Gerald W.* v. *Commissioner of Correction*, 169 Conn. App. 456, 463–64, 150 A.3d 729 (2016) (petitioner bears burden of proving deficient performance and prejudice resulting therefrom), cert. denied, 324 Conn. 908, 152 A.3d 1246 (2017). Accordingly, we conclude that the petitioner has failed to demonstrate that the court abused its discretion in denying the petition for certification to appeal with respect to this claim.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] The court denied the petition for a writ of habeas corpus "except for the restoration of sentence review as ordered previously."

[2] At the habeas trial, the petitioner's counsel examined Ortiz in relevant part, as follows:

"Q. So prior to testifying in the petitioner's case, what understanding did you have about how an individual might get released earlier . . . than the sentence date?

"A. Well, that was never brought up.

"Q. What was your understanding of that process?

"A. My understanding [in] coming forward [was that] Stein said it's not a promise. . . . So I'm going up there willingly myself. . . .

"Q. Well, I'm asking you about your understanding of the process by which you could have been released early from prison. . . . Did you understand that there was some way to get out early?

"A. No . . . it was a hopeful thing I'd get out early, but it was not a promise.

"Q. But did you have an understanding [as] someone who had been involved in the criminal justice system how you might be able to get out early?

"A. Yes. . . . Well, my understanding is . . . I come forward and testif[y]. That was my hope to get out early, but other than that, I came forward myself."

The examination of Ortiz by the petitioner's counsel continued in relevant part, as follows:

"Q. [B]ut you understood that if you participate in a criminal proceeding, there's some chance . . . something could happen that . . . would get [you] out of prison early.

"A. When I participated in it, it was promised—it was hopeful that something would happen, but it was, like Stein said, there's nothing promised.

"Q. So at the conclusion of your discussions . . . with . . . Stein way back before the petitioner's trial, did you leave there with an understanding that you would have an opportunity to get in front of a judge at some point?

"A. No."

[3] General Statutes § 53a-39 (b) provides: "At any time during the period of a definite sentence of more than three years, upon agreement of the

defendant and the state's attorney to seek review of the sentence, the sentencing court or judge may, after hearing and for good cause shown, reduce the sentence, order the defendant discharged, or order the defendant discharged on probation or conditional discharge for a period not to exceed that to which the defendant could have been originally sentenced."

[4] Ortiz testified that in the letter he intended to thank Stein for working on his behalf and that Stein had not promised him anything.

[5] A copy of the completed application was admitted in evidence. The portion of the application entitled "reason for request" states: "[Ortiz] was a prosecution witness in a murder case that resulted in a murder conviction. As a result of his cooperation, [Ortiz'] life has been threatened while he remains incarcerated."

[6] "At the time of the petitioner's trial, it may have been possible for Ortiz to pursue a petition for a writ of [error] coram nobis or . . . a motion to correct an illegal sentence, but there is no evidence that either were even considered, nor that Stein's acknowledgement could have had an appreciable effect on either mechanism of relief. . . ."

[7] The petitioner alleged that implied plea agreements existed between the state, on the one hand, and McIntosh and Jefferson, on the other hand. To the extent that, in its findings of fact, the court referred to plea agreements, it is reasonable to interpret such references as pertaining to these allegations, not the allegations pertaining to Ortiz.

[8] As discussed previously in this opinion, to the extent that, at the hearing on the application for sentence modification, Stein testified that he had reached an "agreement" with Ortiz not to object to the application, it is clear that such agreement was reached following the petitioner's trial and was based on events that occurred following the petitioner's trial.

[9] Intertwined in the analysis of the petitioner's *Brady* claim, which is based upon the state's failure to disclose certain information concerning Ortiz, is an argument that the state "knowingly solicited Ortiz' false testimony concerning 'no promises' and allowed this testimony to stand uncorrected." He argues that the state failed to disclose certain evidence and that the prosecutor failed to correct Ortiz' testimony. It does not appear that the latter aspect of the claim raised on appeal, which is not based upon the state's failure to disclose information concerning Ortiz, but rather on the state's failure to correct allegedly perjured testimony given by Ortiz under *Napue* v. *Illinois*, supra, 360 U.S. 264, was distinctly raised before the habeas court or that the court considered this claim in denying the petition for a writ of habeas corpus.

"A petition for a writ of habeas corpus must set forth specific grounds for the issuance of the writ. Practice Book § 23-22 (1) specifically provides that the petition shall state the specific facts upon which each specific claim of illegal confinement is based and the relief requested . . . . A reviewing court will not consider claims not raised in the habeas petition or decided by the habeas court. . . . Appellate review of claims not raised before the habeas court would amount to an ambuscade of the [habeas] judge." (Internal quotation marks omitted.) *Rodriguez* v. *Commissioner of Correction*, 131 Conn. App. 336, 351, 27 A.3d 404 (2011), aff'd, 312 Conn. 345, 92 A.3d 944 (2014). "It is well settled that [t]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . The principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Internal quotation marks omitted.) *Abdullah* v. *Commissioner of Correction*, 123 Conn. App. 197, 201–202, 1 A.3d 1102, cert. denied, 298 Conn. 930, 5 A.3d 488 (2010). The petitioner argues that he raised the *Napue* issue sufficiently in his pretrial and posttrial briefs, yet he does not dispute that he did not raise this issue in his amended petition, which framed the issues before the court, or that the court did not address the issue, the resolution of which requires distinct factual findings, it in its memorandum of decision. Accordingly, we will not consider this claim in our analysis of the court's decision to deny the petition for certification to appeal.

[10] Additionally, the petitioner argues that this court "should exercise its supervisory authority to require a jury instruction concerning the sentence modification procedure in Connecticut any time the state represents to a sentenced inmate that the state will make the witness' cooperation known." "[O]ur supervisory authority . . . is not a form of free-floating justice, untethered to legal principle. . . . [T]he integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers are invoked only in the

rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Kuncik*, 141 Conn. App. 288, 292–93, 61 A.3d 561, cert. denied, 308 Conn. 936, 66 A.3d 498 (2013). As discussed previously in this opinion, *Brady* requires the disclosure of evidence that is favorable and material to the defense, including impeachment evidence. *State* v. *Ouellette*, supra, 295 Conn. 185–87. The petitioner has not persuaded us that the protections afforded under *Brady* do not adequately protect his right to a fair trial.

---